THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SILAS FLETCHER, Defendant-Appellant.

First District (1st Division)   No. 62536

Opinion filed April 10, 1978.

312

James J. Cutrone, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McGLOON delivered the opinion of the court:

Defendant Silas Fletcher was convicted of the aggravated kidnapping and murder of Hillside police officer Anthony Raymond. The evidence indicated that someone matching the defendant's general description robbed the Swedish Manor Restaurant. Minutes later, someone matching defendant's description was also stopped on the Eisenhower Expressway at Mannheim Road, for an apparent traffic violation. Officer Raymond was identified as the arresting officer.

Officer Raymond was never seen or heard from again. His abandoned squad car was found on the Eisenhower Expressway at Mannheim Road.

One year later, his body was found buried on the property of defendant's brother-in-law, in Rhinelander, Wisconsin.

During the jury trial, the People introduced into evidence Officer Raymond's radio transmission, made just before the traffic stop on the expressway. It was the People's theory that defendant robbed the Swedish Manor Restaurant and abducted and killed Officer Raymond during the escape, in order to avoid capture. The People argued that at least one stolen auto was used during the robbery/abduction-murder and during closing arguments, noted defendant's prior Indiana conviction for armed robbery.

During the conference on instructions to the jury, it was agreed that Illinois Pattern Jury Instructions, Criminal, No. 3.02 (hereinafter IPI Criminal) would be read to the jury. During trial, however, the trial judge failed to read the second paragraph of the instruction to the jury.

The jury subsequently found the defendant guilty of aggravated kidnapping and murder. He was sentenced to serve 100 to 200 years in prison.

On appeal, defendant argues that (1) evidence of the radio transmission was hearsay and inadmissible; (2) evidence of other crimes was inadmissible because of their prejudicial effect; (3) failure of the trial judge to read the second paragraph of IPI Criminal No. 3.02 was reversible error; and (4) defendant was not proved guilty beyond a reasonable doubt.

We affirm.

On October 1, 1972, Hillside police officer Anthony Raymond disappeared. His empty squad car was found on a ramp to the Eisenhower Expressway at Mannheim Road. In August 1973, his body was found buried on a farm in Rhinelander, Wisconsin. The cause of death was determined to be a number of stab wounds in the back.

One of the persons charged with Officer Raymond's kidnapping and murder was defendant Silas Fletcher. After hearing all of the evidence, a jury found Fletcher guilty of murder and aggravated kidnapping. He was sentenced to serve 100 to 200 years in the penitentiary.

During the trial, it was the People's theory that Fletcher abducted and later killed Officer Raymond in order to avoid being apprehended for a robbery committed moments earlier.

Lawrence Thomas, manager of the Swedish Manor Restaurant in Hillside, Illinois, testified that on October 1, 1972, at approximately 10 p.m., the restaurant was robbed by two armed men. His son testified that as he left the restaurant a few minutes before 10 p.m., he noticed a full-sized, dark-colored automobile in the employees' parking lot. He did not recognize the auto as one belonging to any of the employees.

After his son departed, Mr. Thomas went outside to move his own car.

When he re-entered the restaurant, he was confronted by a man with a gun. The man was only a couple of feet away and he forced Mr. Thomas to lie on the floor while he went through his pockets, taking money. The man also went through Mrs. Thomas' purse and asked for jewelry.

Mr. Thomas was ordered to open the safe and did so. The robber then removed the "microphone" from the telephone receiver and took it with him. He ordered Mr. Thomas and the others to stay in the office for five minutes. The robber then left. In all, close to $5,000 was taken.

During the robbery, Mr. Thomas saw only the man with the gun, who spoke to an accomplice in the other room whom he called "Kid." Mr. Thomas described the man he saw as white, about 28 to 30 years old, about 5 feet, 8 inches tall, and weighing about 165 or 175 lbs. He was well built and looked very athletic, with broad shoulders and narrow hips. Mr. Thomas estimated the man's waist size as approximately 30 or 32 inches. The man wore something resembling a dirty undershirt over his face; however, Mr. Thomas could see that he had light skin and hazel or blue eyes. He wore a short levi, "Eisenhower-type" jacket, that was faded blue. His matching "levi" pants were not flared and his shoes were a brownish-gray suede. He also wore a multicolored hat that a golfer or fisherman might wear.

The testimony at trial indicated that Officer Raymond was abducted shortly after 10 p.m. on October 1, 1972. The People produced a number of witnesses who testified concerning this point.

Herbert Wessler, an employee of a Shell gas station on Mannheim Road, near the Eisenhower Expressway, testified that he was playing football with some other employees on the evening of October 1. He saw a black-over-red 1968 to 1970 Cadillac screeching around the corner of Harrison and on to Mannheim. The auto was being pursued by a police car. The cars stopped on the westbound ramp to the expressway. When Mr. Wessler looked again, 10 or 15 minutes later, only the police car remained.

Lawrence Zuley, a radio operator for the Hillside Police Department, was on duty the evening of October 1, 1972. He testified that at approximately 10:15 p.m., he received a communication from Officer Raymond. When evidence of this communication was presented during trial, the jury was instructed that it was admissible, not for the truth of the statement, but for the fact that the statement was made.

The radio transmission was:

"[Car] 406, Hillside, traffic stop, Mannheim and the I-90 double "L", Lincoln."

The number of the license plate was inaudible, due to another transmission received at the same time. Repetition of the message was requested, but none was received. It was later established that a 1968

Cadillac, with 1972 license plates LL 781, was registered to defendant's wife.

Robert Eaton, Jr., was riding in a car at approximately 10 p.m. on October 1. He was traveling eastbound on the Eisenhower Expressway, exiting northbound on Mannheim Road. He observed a Hillside squad car on the westbound ramp, along with another large car, a Cadillac or an Electra, that appeared to be goldish-brown in color. The car had at least two passengers. Because he and his girlfriend were playing a game that required thinking of people whose initials matched the prefixes of license plates, he noticed that the license prefix on the Cadillac or Electra was "LL", the same as his girlfriend's initials. Mr. Eaton, however, could not be sure of the color of the car.

Michael Sangiacomo testified that he observed the auto at approximately 10:15 p.m. He stated that the civilian auto was a 1970 Cadillac Coup de Ville, burgundy with a dark brown or black top. He recognized Anthony Raymond standing in front of the squad car and walking toward another man. Sangiacomo described the other man as being 5 feet, 10 inches tall, weighing 210 lbs., about 32 to 37 years old, and being muscular, with a flat stomach and tapered waist. The man had brownish, wavy hair and wore a turtleneck sweater with straight-leg slacks.

Finally, Marvin Canniff testified that he observed a Hillside squad car and a two-door Cadillac Coup de Ville on the expressway ramp. He described the car as being a 1969 or 1970 model, brown in color. Standing near the car were two men; one was a police officer, the other was a white male, about 5 feet 9 inches tall. The white male weighed about 180 lbs. and had a muscular build. He wore a turtleneck sweater and dark clothes.

Mr. Canniff testified that he also saw another man in the car. This man was described as having a pug nose and blondish hair.

During the trial, the People argued that defendant used a stolen car during the robbery of the Swedish Manor Restaurant and thereafter switched back to his own auto. Several witnesses testified on this matter.

Jack Pryor and Timothy Hinsdale testified that they drove to Hillside on the evening of October 1, 1972. They were to visit a friend. They parked their car on Oak Ridge Avenue, behind a burgundy Cadillac with a black vinyl top. The car was described as a 1968 to 1970 model. Neither one had seen the Cadillac before and Jack Pryor testified that he had previously seen very few Cadillacs in that area.

The two youths arrived at their friend's home at approximately 9:55 p.m. and stayed somewhere between 3 and 10 minutes. When they left the Cadillac was still there.

Mrs. Ruth Lommatzach, a resident of Oak Ridge Avenue, testified that some time between 10 and 10:30 p.m. on October 1, 1972, she heard a car

pull up outside. She heard the doors of a vehicle open and then two voices. Unable to understand what was said, she believed she heard a protesting voice and a commanding voice. She then heard doors closing and a vehicle leaving.

The next morning, Mrs. Lommatzach saw a blue car in front of a nearby driveway. Her husband summoned the police. Officer Richard Zimanzl responded to the call.

Officer Zimanzl testified that he determined the vehicle to be a blue 1967 Chevrolet that had been reported stolen. Under the seat, Officer Zimanzl found a second set of license plates. In the glove compartment, he found an application for still another set under the name Orisno Orapeza. The license plates mounted on the car were WJ 9317.

Orisno Orapeza was the owner of a blue 1967 Chevrolet that was stolen. Mr. Orapeza identified a photograph of the blue Chevrolet found on Oak Ridge as the car stolen from him.

Leolugado Lopez owned a white 1967 Chevrolet which was stolen on August 25, 1972. The car was returned to him several days later, but minus the license plates. He believed the license plate numbers to be WJ 9317, the same as those found on Mr. Orapeza's stolen Chevrolet.

At approximately midnight on October 1, 1972, a disabled jeep was spotted on the westbound ramp of the Northwest Tollway at Route 59, by Illinois State Trooper Randall Rushing. The jeep was registered to defendant Silas Fletcher. Trooper Rushing testified that there were three persons in or about the vehicle and when confronted, stated that they were out of gas.

Trooper Rushing walked to the rear of the vehicle, which was a white jeep station wagon and noticed an upright, 55-gallon drum with a lid. Trooper Rushing did not inspect the contents of the drum. Nevertheless, it was the People's theory during trial that the drum contained the body of Officer Raymond and that defendant and his companions were on their way to Wisconsin to bury it.

In 1972 defendant's sister, Mary Ann Ehmann, lived in Rhinelander, Wisconsin with her husband James. They owned five 40-acre tracts of land.

On October 2, 1972 James was awakened by a knock on the door at 6:15 or 6:30 a.m. Defendant had arrived along with two other men, introduced as Robert Martinez and Jesse Millard. They had arrived in defendant's white Jeep. James awakened Mary Ann and told her that defendant was in the driveway with some friends. After getting dressed, James and Mary Ann joined defendant and his friends in the kitchen for breakfast. Defendant stated that he and his friends had been out drinking all night.

At one point, James noticed defendant's absence. He looked outside

and saw the defendant washing the floor of the Jeep with a hose. James walked over and noticed that a red substance was being washed out of the Jeep. Familiar with blood from having butchered animals, James testified that the substance appeared to be blood. The blood had dried and defendant was using his hand to loosen it. When James asked the defendant what he was doing, defendant just shrugged.

James asked: "Did you do away with another squealer?" Defendant allegedly responded: "Yeah, yeah." When asked how, defendant allegedly responded: "Sitting on a seat; knifed him in the ribs." James inquired whether the body might be discovered, at which point defendant became very angry and said: "The son-of-a-bitch, the son-of-a-bitch; they'll never find him." Seeing how upset defendant was, James went into the house. James testified further that he did not see a 55-gallon drum in the Jeep.

Mary Ann testified that before breakfast, defendant telephoned his wife. In the course of the conversation, Mary Ann heard him say that he "got five" and then inquire whether he had received any messages. It was the People's theory that the "five" defendant referred to was the nearly $5,000 taken in the robbery of the Swedish Manor Restaurant. Defendant later testified in his own defense and stated that "got five" referred to five messages that he had received.

Both Mary Ann and James testified that the defendant arrived that morning wearing an Eisenhower levi jacket and levi pants. They testified that he was between 5 feet, 8 inches and 5 feet, 10 inches tall, and weighed between 180 and 200 lbs. He was very muscular, barrel-chest, with large arms and legs, and a narrow waist. Defendant had brown, wavy hair and bluish-hazel eyes.

Mary Ann and James also described Martinez and Millard. Martinez was dark, between 5 feet, 8 inches and 5 feet, 10 inches tall, and weighed approximately 150 lbs. Millard's stature was almost identical, but he had prematurely gray hair, a gaunt face, blue eyes and a pug nose. He wore a dark jacket, pants and a checkered shirt.

The body of Officer Raymond was discovered in August 1973. Acting on information from an informant, law enforcement officials from Illinois went to Rhinelander, Wisconsin, to search the Ehmann property. It was at this time that James Ehmann first learned of Officer Raymond's disappearance.

The men searching for the body were equipped with shovels and mine detectors. One of the searchers noticed a spot where the ferns were not as high and thick as in other areas. A police officer probed the ground with a shovel and struck a sharp object, which later proved to be a five-star badge on a blue coat. The area was excavated and a body was retrieved.

As the body lay on its side in the grave, the head was tilted back and the

arms were handcuffed behind the back. The legs were bent back at a severe angle, with feet drawn up toward the buttocks. The body was clothed in a light blue shirt and wore a Hillside badge and name tag on which was printed "A. Raymond." The body was later identified by means of fingerprints as that of Anthony Raymond.

A white, clay-like substance, "barn lime," was found in the immediate area of the grave. Also found nearby was a Slaymaster padlock. James Ehmann identified the lock as appearing to be one that he placed on a gate that crossed a road on his property. James testified that defendant was familiar with his tracts of land because he and defendant occasionally hunted there. James also stated that approximately one week after defendant's October 1972 visit, he noticed that someone had taken the padlock off the gate and replaced it with an old, broken one that had been in one of the cabins on the property.

Dr. William Bauman, a pathologist, performed an autopsy on the body. An external examination revealed four stab wounds in the back. They were inflicted in the lower portion of the rib cage, angling down toward the mid-line. Three of the wounds penetrated the chest cavity and the two that pierced the lung were mortal wounds.

Richard Thompson, a laboratory analyst for the Wisconsin Department of Justice and whose height and weight were similar to Officer Raymond's testified that he experimented with a 55-gallon drum. After several efforts, he found that he was able to position himself inside so that the lid could be closed. In order for him to accomplish this, it was necessary for him to pull his legs back and up so that he was on his knees, with his hands behind his back. Officer Raymond's body was in a similar position when found.

During the trial and after having been granted immunity, Douglas Fletcher, defendant's brother took the stand. He testified that in 1970, two years before the abduction and murder of Officer Raymond, he and defendant made a trip to the Ehmann property in Rhinelander, Wisconsin. He stated that their purpose was to bury a body.

Douglas Fletcher testified that between Thanksgiving and Christmas of 1970, defendant asked him to help bury the body of a woman who died during an abortion. Douglas agreed and they set out for Rhinelander, Wisconsin, arriving about midnight. Douglas described how he and the defendant dug the grave in a heavily forested area and how defendant poured lime on the body after it was placed in the grave. Defendant allegedly stated that he was burying the body as a favor for a friend who operated an abortion ring and that he hoped to be paid for any future burials. Defendant, however, was burying this body for free.

In October, 1973, Douglas Fletcher led police officers to a grave site 195

feet from where the body of Officer Raymond was recovered. The body of a woman was recovered.

During the trial, defendant testified on his own behalf. He denied the kidnapping, murder, and burial of Officer Raymond. He also denied the armed robbery of the Swedish Manor Restaurant, riding in a stolen car on October 1, 1972, washing blood from his Jeep, and telling James Ehmann about any stabbing. Defendant admitted having breakfast with the Ehmanns on October 2, 1972, but stated that his reason for going to Rhinelander was to go hunting with friends. In fact, defendant stated that he had been hunting on the Ehmann property since September 28, but had merely failed to contact the Ehmanns until October 2. He denied ever calling Jesse Millard "Kid," but admitted calling him "Hillbilly." However, a friend of Millard's, Patricia Harder, testified that his nickname was "Hillbilly" and "Kid."

On the day before closing argument, a conference was held for the purpose of determining jury instructions. During this conference it was agreed that IPI Criminal No. 3.02 was to be read to the jury. The instruction reads as follows:

> "Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of [a] defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict. [You should not find the defendant guilty unless the facts and circumstances proved exclude every reasonable theory of innocence.]"

Nevertheless, when the instruction was finally read to the jury, the trial judge omitted the second paragraph of the instruction. No reason was given for the omission, nor can one be found in reviewing the record.

After all the evidence was heard and the jury instructions given, the defendant was found guilty of murder and aggravated kidnapping. He was sentenced to serve 100 to 200 years in prison. He now appeals.

On appeal, defendant first argues that he was denied a fair trial because of the improper admission of evidence relating to four, unrelated offenses allegedly committed by the defendant. These offenses are: the armed robbery of the Swedish Manor Restaurant, the theft of two automobiles, and the burial of a woman who died as the result of an illegal abortion. Defendant argues that admission of these alleged offenses into evidence made the prosecution a series of trials within a trial and required the defendant to defend against numerous irrelevant allegations which tended to besmirch his character.

We disagree. The evidence of the armed robbery and the stolen automobiles was part of the relevant chain of circumstances. Evidence of

the burial of the abortion victim demonstrated defendant's *modus operandi.* We will consider each offense separately.

As to the robbery of the Swedish Manor Restaurant, defendant asserts that evidence of the robbery was improperly admitted because the offense could not have served as a motive for the abduction and murder of Officer Raymond. On the contrary, we believe the evidence was admissible for precisely that reason.

■■ Where evidence of other offenses is admitted to show motive or common scheme, proof of these other crimes need not be beyond a reasonable doubt. (*People v. Parker* (1976), 35 Ill. App. 3d 870, 343 N.E.2d 52; *People v. Everett* (1973), 14 Ill. App. 3d 421, 302 N.E.2d 723.) Here, a great deal of evidence indicates that defendant was one of the men who robbed the Swedish Manor Restaurant. Lawrence Thomas described the robber as being well-built, athletic, and having broad shoulders and narrow hips. Although Mr. Thomas could not see the robber's face, due to the fact it was covered, he was able to determine that the man's skin was light and that his eyes were hazel or blue. The robber also wore a levi outfit, including a short, "Eisenhower" type jacket. Because this description matches the one given concerning the man seen talking to Officer Raymond on the Eisenhower Expressway and the Ehmanns' description of defendant on the morning of October 2, 1972, evidence concerning the robbery of the Swedish Manor Restaurant was admissible.

Since there were sufficient facts to connect defendant with the robbery of the Swedish Manor Restaurant, evidence of that robbery was admissible as a motive for the abduction and murder of Officer Raymond. (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) Assuming that defendant committed the robbery, his need to escape undiscovered would be a sufficient motive for abducting and murdering Officer Raymond. Such is the case even if Officer Raymond was unaware of the robbery that occurred minutes earlier and had merely stopped the defendant for a traffic violation. This is so because it is not the arresting officer's particular knowledge of the crime which is critical in establishing motive, but the *defendant's* own consciousness of guilt and the resulting need for concealment. See *People v. Matheson* (1940), 373 Ill. 374, 26 N.E.2d 465.

■■ Similarly, evidence relating to the autos stolen from Orisno Orapeza and Leolugado Lopez was also relevant and admissible. Evidence that Mr. Orapeza's blue Chevrolet was abandoned where a maroon Cadillac had previously been forms part of the link between the armed robbery and Officer Raymond's abduction and murder. When the auto was examined by police officers, it was found to bear the license plates of Mr. Lopez' white Chevrolet, which had also been stolen.

Finally, defendant argues that Douglas Fletcher's testimony relating to

the 1970 burial of a woman who died during an abortion was improperly admitted. He argues that the testimony was evidence of another homicide and was therefore prejudicial.

We cannot concur. In *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489, the court noted that evidence of other offenses is admissible to show *modus operandi*. In *McDonald*, the defendant was on trial for burglary. The testimony of another of defendant's victims was held to be admissible because the *modus operandi* in both instances was similar.

■■ Similarly, the burial of another body by defendant, in a place and manner so strikingly similar to Officer Raymond's burial, renders the testimony admissible in order to show defendant's method of operation. Both corpses were brought from the Chicago area and buried in a remote, desolate and heavily forested area, accessible by means of a winding dirt road. They were buried only 195 feet apart, on the same side of the road, and covered with lime. The site was on or near land owned by the defendant's brother-in-law. Defendant had gone hunting in this area and by his own testimony, was familiar enough to find his way around in the dark.

■■ Similarly, Douglas Fletcher's explanation that defendant hoped to be paid for future burials was also not prejudicial. First of all, no objection to this testimony was made during the trial and cannot now be raised on appeal. Secondly, the testimony was relevant to explain why defendant undertook the risk of burying a woman he did not kill.

Another of defendant's contentions on appeal is that the trial court improperly admitted evidence of Officer Raymond's radio transmission. The transmission was:

> "406, Hillside, traffic stop, Mannheim and the I-90, double "L" Lincoln."

Defendant argues that this transmission was offered to prove the truth of the matter asserted, namely, that the first two letters on the plates of the auto being stopped were "LL". As such, the statement is inadmissible hearsay. Defendant also argues that admission of the statement was prejudicial.

We do not believe the transmission was hearsay and even if it was, its admission into evidence was harmless error due to the fact that its contents were cumulative of other competent evidence.

■■ The recognized exceptions to the hearsay rule are based on the theory that evidence of a statement may have probative value for some reason other than proof of the matter asserted. One of these exceptions is to establish the intent or state of mind of the declarant. *People v. Newbury* (1972), 53 Ill. 2d 228, 290 N.E.2d 592. See also *People v. Perry* (1974), 22 Ill. App. 3d 738, 318 N.E.2d 17 (abstract); *People v. Reddock* (1973), 23 Ill. App. 3d 296, 300 N.E.2d 31.

■■ In the present case, the radio transmission sent by Officer Raymond

was made in the course of his duties and demonstrated his intent to stop the vehicle near which he was seen, just prior to his disappearance. The transmission is relevant because it was Officer Raymond's intent to stop the vehicle that made the defendant and his accomplice vulnerable to discovery and triggered their motive for kidnapping and murder. Consequently, the statement was admissible as an exception to the hearsay rule.

■■ Even if the transmission was inadmissible hearsay, its admission into evidence was harmless error. First of all, the jury was admonished as to the limited purpose of the transmission on several occasions. Secondly, even if the instructions were ineffective, the evidence was not prejudicial because everything in the transmission was cumulative of other competent evidence. Michael Sangiacomo testified that he recognized Officer Raymond on the expressway ramp at Mannheim Road. Other witnesses also observed a Hillside squad car with a civilian vehicle on the ramp. Most importantly, Robert Eaton testified that the license plates on the civilian vehicle had the prefix "LL", which he noticed because of a little game he and his girlfriend were playing at the time. Consequently, any error would have been harmless since the evidence was cumulative of other properly admitted evidence. *People v. Daliege* (1976), 40 Ill. App. 3d 706, 352 N.E.2d 247; *People v. Cole* (1975), 29 Ill. App. 3d 369, 329 N.E.2d 880.

Defendant next argues that the trial court erred in failing to read the second paragraph of IPI Criminal No. 3.02 to the jury. The second paragraph reads:

> "You should not find the defendant guilty unless the facts and circumstances proved exclude every reasonable theory of innocence."

The committee note to IPI Criminal No. 3.02 states that "the second paragraph should be given only when the proof of guilt is entirely circumstantial." While much of the evidence in this case is circumstantial, it is not entirely circumstantial.

James Ehmann testified that on October 2, 1972, the morning after Officer Raymond's abduction, he saw defendant washing blood out of the Jeep. Mr. Ehmann asked: "Did you do away with another squealer?" Defendant allegedly replied: "Yeah, yeah." Asked how he had done it, defendant supposedly said: "Sitting on a seat; knifed him in the ribs." When asked about the corpse, defendant replied angrily: "The son-of-a-bitch, the son-of-a-bitch; they'll never find him."

■■ In *People v. Carbona* (1975), 27 Ill. App. 3d 988, 327 N.E.2d 546, we held that admissions by a defendant were sufficient direct evidence to obviate the need for giving the second paragraph of the instruction. (See also *People v. Brown* (1974), 56 Ill. 2d 312, 307 N.E.2d 356, *rev'd on other*

*grounds* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254; *People v. Brooks* (1972), 7 Ill. App. 3d 767, 289 N.E.2d 207.) Similarly, we find that defendant's admission that he did away with another squealer, knifing him in the ribs, is direct evidence of his guilt of the murder of Officer Raymond. Thus it was not necessary that the second paragraph of the instruction be read to the jury.

Defendant next contends that the trial court erred in allowing the admission of defendant's Indiana conviction for armed robbery into evidence during rebuttal arguments. Defendant argues that any probative value was outweighed by prejudice to his case.

■■ We disagree. In 1974, defendant was convicted for armed robbery in Indiana. During rebuttal, the People offered evidence of this crime to impeach defendant's credibility. The trial judge noted that discretion must be exercised in determining whether such evidence should be admitted. In concluding that evidence of the robbery conviction was admissible, the trial judge considered the nature of the prior conviction, its remoteness, defendant's subsequent career, and the similarity to the offenses charged. In light of these circumstances, we believe that evidence of the armed robbery conviction was admissible under *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, and that the trial court did not abuse its discretion. The standards set out in *Montgomery* were met.

Defendant also alleges the existence of other errors committed during the People's closing arguments. We view these allegations of error as being of a minor nature and not requiring discussion. Even if the allegations were true, the error would be harmless, due to the overwhelming evidence of guilt.

Lastly, defendant claims that he was not proved guilty beyond a reasonable doubt. He cites conflicts in testimony and the large quantity of circumstantial evidence presented during trial.

■■ First, conflicts in testimony are not uncommon and it is the responsibility of the jury to resolve these conflicts. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.) Second, a conviction based entirely on circumstantial evidence is not improper. (*People v. Williams* (1977), 66 Ill. 2d 478, 363 N.E.2d 801.) Based on the evidence presented during trial, we cannot say that the evidence failed to prove the defendant guilty beyond a reasonable doubt.

While most of the evidence presented by the People was circumstantial, it nevertheless established a strong case against the defendant. The evidence was overwhelming and conclusive and was corroborated by defendant's admission to his brother-in-law as well.

The evidence presented by the People revealed a morbid scenario. Shortly before 10 p.m. on October 1, 1972, a person matching defendant's

description robbed the Swedish Manor Restaurant. His accomplice was a man referred to as "Kid," a nickname also used by defendant's friend, Jesse Millard. Evidence indicated that the getaway may have been made in a stolen Chevrolet, which was later found on Oak Ridge Avenue. A car matching the description of defendant's Cadillac was seen parked on Oak Ridge Avenue the same time that night. A few minutes later, a person matching the description of defendant and driving an auto matching the description of defendant's Cadillac was seen stopped on the Eisenhower Expressway. This person not only fit the description of defendant, but also the person who robbed the Swedish Manor Restaurant minutes earlier. The auto was apparently stopped because of a traffic violation.

The arresting officer was identified as Anthony Raymond. Officer Raymond was never seen alive again. His body was later found buried on property belonging to defendant's brother-in-law. The grave site was only 195 feet from where evidence indicated defendant buried an abortion victim two years earlier.

At midnight on the night of Officer Raymond's disappearance, defendant and two other persons were spotted on the Northwest Tollway. The Jeep in which they were riding contained a sealed 55-gallon drum. The vehicle was headed in the direction of Wisconsin.

The next day, defendant and two companions were at his brother-in-law's home in Rhinelander, Wisconsin. Defendant was seen washing a red substance out of the bottom of his Jeep and allegedly told his brother-in-law that he had just done away with another "squealer" by knifing him in the ribs. One year later, Officer Raymond's body was discovered buried on the premises.

After hearing all of the evidence concerning the crimes charged the jury found defendant guilty of aggravated kidnapping and murder. We feel the evidence presented at trial amply supports their verdict.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

GOLDBERG, P. J., and O'CONNOR, J., concur.