THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JERRY L. ROSS, Defendant-Appellant.

Fourth District   No. 15557

Opinion filed October 14, 1980.

Richard J. Wilson and Diana N. Cherry, both of State Appellate Defender's Office, of Springfield, for appellant.

Paul C. Komada, State's Attorney, of Charleston (Gary J. Anderson and Karen L. Boyaris, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE TRAPP delivered the opinion of the court:

Defendant appeals his conviction of murder entered upon a jury verdict and a sentence of 20 to 60 years imposed.

Upon appeal, defendant argues that (1) prejudicial argument by the prosecution required defendant to prove his innocence, (2) the trial court erred in admitting into evidence two photographs of the body of the victim after it was removed from the stream where found, and (3) that the trial court erred in refusing to instruct the jury upon circumstantial evidence in the language of the second paragraph of Illinois Pattern Jury Instructions, Criminal, No. 3.02 (hereinafter IPI Criminal) requiring the jurors to exclude "every reasonable theory of innocence." No issue of proof beyond a reasonable doubt is explicitly raised.

On April 24, 1977, the body of the victim was discovered in shallow water beneath a bridge by an individual on a family outing. The autopsy disclosed that death resulted through a massive crushing blow to the right front portion of the skull. The medical opinion was that the degree of injury required that a blunt object be swung through a wide arc with great force.

The significant witnesses at the trial include Fasig, Leonard, Ruffner, and the defendant. These witnesses, as well as several lesser players, had established records of felony convictions and were impeached to some degree both by reason of convictions and through testimony disclosing inconsistent statements. The defendant had been convicted of burglary, theft, and armed robbery and was on parole at the time of this offense.

On September 9, 1977, a search warrant was executed at the home of defendant and the latter's car was impounded and searched. A baseball bat was seized at the home and forensic examination disclosed a spot of Type B blood on the handle. This was the blood type of the victim. Defendant's blood was Type O. The expert testimony is that Type B

blood is found in 8½ percent of Caucasian persons. Examination of defendant's automobile produced nothing of evidentiary value.

It appears that the search under warrant followed the receipt of information in late August from the mother of Sharon Ross, wife of defendant, and Tana Little, a sister of Sharon.

Tana Little testified that she was staying at the home of her sister, Sharon, and the defendant on the night of April 23, 1977, and that defendant returned home at about 1 a.m. on April 24. Defendant was described as intoxicated. He left at about 2 a.m. and again returned sometime after 4 a.m. He was described as intoxicated. At Sharon's request, the witness went to defendant's car where she observed a small amount of blood on the trunk bumper, inside the trunk, and in the car. She observed a baseball bat in the trunk with an apparent blood stain on the handle. The witness stated that the baseball bat seized upon search of the house was not the same as the one she saw in the trunk.

The witness testified that defendant then explained that he had been in a fight at a tavern and that he stated that he would wash out the trunk of the automobile.

Fasig and the victim had spent the evening on Friday, April 22, at various bars drinking and using drugs. They retired at the home of a friend. Beginning on Saturday morning, they spent the day going to various taverns and continued the drinking. The victim was also said to be using "downers."

Fasig testified that he and the victim planned to live together and that they went to view certain premises as a place to live. After the bars closed for Saturday night, he and the victim went to the home of a friend as a place to stay but could arouse no one. They then parked adjacent to an intersection hoping that a friend might pass who would permit them to stay overnight. At this time the victim was "passed out," and as they waited Fasig "passed out."

Such account was verified to the extent that city police observed Fasig's automobile at 1:10 a.m. at the stated location and they observed Fasig sleeping. They also observed an individual with long hair sleeping on the seat and believed that it was a woman. Fasig was unsure whether he had later taken the victim to any place for the night. His mother testified that he returned home at about 2 a.m., went to sleep on the couch and remained the rest of the morning. The mother was particularly wakeful and concerned because she had expected Fasig to drive to Carbondale that night, while he was obviously intoxicated.

Fasig testified that on Sunday, April 24, late in the morning, he went to several places looking for the victim; that he resumed drinking with friends and learned of the death of the victim on Sunday evening. He testified that he then called the sheriff to say that he had been with the

victim and later delivered the victim's shoes and socks which had been in his automobile to the sheriff. He subsequently consented to a search of his home and was interviewed by the police on several occasions. During cross-examination, the jury was advised that Fasig had been considered a suspect in the murder. On cross-examination, Fasig could not recall that he had stated to Sandra French, with whom he had formerly lived, that he, Fasig, did not know whether or not he had killed the victim.

Fasig's testimony is correlated with other prosecution testimony in certain aspects. He testified that he had been acquainted with defendant for several years and that they met in a bar on the afternoon of April 23. At that time he introduced defendant to the victim. Incident to this meeting, Fasig delivered some "downers" to defendant, and they parted with a general understanding that if defendant approved the quality he would get more from Fasig.

The prosecution witness, Leonard, was a nephew of Fasig. He was aware of the latter's parole status and that Fasig was a suspect in this murder. Leonard was then subject to felony charges pending trial and was also on parole.

Leonard had been acquainted with, or a friend of, defendant for several years and lived about a block from the home of the latter. The witness had learned of the fact that defendant's home and car were searched pursuant to warrant, and he went to defendant's home on the evening of that search. At that time defendant showed him the warrant, and Leonard testified that he noticed the word "murder" appeared on such warrant.

Leonard testified that on an evening at the end of August or the beginning of September 1977, he and defendant had been drinking steadily and driving about aimlessly. Their discussion included the death of the victim. Leonard testified that on this evening at the rather remote unoccupied farm in evidence the defendant stated that he had seen Fasig on the day preceding the discovery of the murder at which time Fasig had given him some "downers." Later defendant observed Fasig's parked automobile and the latter "passed out" in the front seat. When defendant stopped, the victim was awake and trying to arouse Fasig.

The place indicated to Leonard by defendant was the intersection to which Fasig had testified. There is verification of defendant's presence in that at about 1 a.m. on April 24 the city police stopped defendant for a traffic violation at a point within a block of such intersection.

Leonard testified, in sum, that defendant stated that the victim indicated that she needed a ride home and defendant offered to drive her. Defendant drove the victim to the remote farm house where he and the victim were smoking "pot" and "blowing shotguns." Defendant reported to Leonard that he had tried to kiss the victim and she started to slap him

and denounced defendant with obscenities. Leonard quoted defendant as saying, "If anybody fires on me I am going to fire back." Defendant was described as crying and said, "I killed her, Bub. I didn't mean to. It was an accident." Leonard further quoted defendant as saying that he had killed her at the site of this farm.

The owner of the farm described in evidence testified that she had taken defendant to the premises at a time prior to the murder and had given him permission to hunt there.

Leonard agreed that he did not tell any one of the conversation with the defendant until he, Leonard, was placed in jail for parole violation, and that he did not at first tell the police that the place of the murder was said to be the farm premises. On cross-examination, Leonard agreed that he wished to make a deal for himself upon the pending charges and to help his uncle (Fasig), but concluded that he would not be able to do so.

Ruffner, a prosecution witness, was shown to have been in the Cumberland County jail from September 23, 1977, to January 5, 1978. Defendant was held there as a parole violator from October 20 to December 14, 1977. Ruffner was then being held upon a charge of deceptive practices and was later placed on conditional discharge. He had not known defendant prior to their common incarceration and testified that he then had no knowledge of the death of the victim and the homicide investigation. Ruffner stated, after defendant's hearing as a parole violator and just before the defendant was returned to Vandalia as such violator, that he had a conversation with defendant. At that time defendant told him that he and Bubba Leonard picked up the victim at an unidentified time and place and went out into the country where defendant became mad and hit her with a ball bat. He then stuffed the body in the trunk and threw her from a culvert. Ruffner reported the conversation to the sheriff after defendant was taken from the jail.

Ruffner denied hearing any conversation about the murder other than that with defendant. The witness admitted that while he was in Vandalia he wrote a letter to a public defender denying that he had stated that defendant admitted killing the victim. He testified that he wrote the letter because prisoners at Vandalia "threatened and scared him and told him to write the letter and a guy named Dee put it in words and I wrote it and signed my name to it."

Defendant's testimony, in summary, was a simple denial made to the direct questions: Whether he obtained "downers" from Fasig; whether he caused the death of the victim; whether he told Leonard that he had killed the victim, and whether he had told Ruffner that he had killed her. He also testified that he discussed the search warrant with Leonard and that Ruffner was one of a group in jail at a time when defendant had discussed what he knew of the homicide. In argument, the prosecution recalled to

the jury a number of matters in evidence to which defendant did not undertake to testify or to explain.

Defendant urges that the prosecution's arguments to the jury had the effect of shifting the burden of proof to the defendant and was highly prejudicial. We note that no objection was made by defendant during the course of the argument.

Defendant's citations of *People v. Weinstein* (1966), 35 Ill. 2d 467, 220 N.E.2d 432; *People v. Romero* (1967), 36 Ill. 2d 315, 223 N.E.2d 121; and *People v. Beier* (1963), 29 Ill. 2d 511, 194 N.E.2d 280, are neither apposite nor persuasive upon the issue. Argument in such manner has been approved in *People v. Middleton* (1976), 38 Ill. App. 3d 984, 350 N.E.2d 223, and *People v. Gonzales* (1978), 60 Ill. App. 3d 980, 377 N.E.2d 91. Where the defendant undertakes to testify, his testimony is subject to the same scrutiny and comment as that of any witness. In *Middleton,* the court stated:

> "But defendant has cited no cases for the quite different proposition he asserts that an accused can take the stand at trial, deny some but not all of the evidence against him, and then claim immunity from prosecutorial comment on his failure to answer the rest of the evidence during his testimony." 38 Ill. App. 3d 984, 993, 350 N.E.2d 223, 230.

*Middleton* and *Gonzales* each concluded that argument upon defendant's failure to testify to matters in evidence did not deprive defendant of fifth amendment rights. Again, it is apparent that in the statement and context made, the argument by the prosecution does not call upon defendant to prove himself innocent.

Again, the prosecution's argument concerning defendant's failure to disclose criminal records of witnesses called by defendant was not objected to at trial. The trial court, however, *sua sponte* admonished counsel and instructed the jury to disregard the remark. We find no error which requires further consideration.

Other contentions made with regard to the prosecution's argument essentially concerned inferences to be drawn from facts in evidence, or remarks upon the credibility of the witnesses and their testimony. We find the several matters referred to do not constitute prejudicial error.

■■ Defendant urges that the trial court erred in denying his motion *in limine* and in thereafter admitting into evidence two colored photographs of the victim after removal from the stream where she was found. He contends that the exhibits were so gruesome as to be highly prejudicial and to be unnecessary to establish a cause of death because a complete description of the injuries had been stated by a pathologist. In *People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6, the court affirmed admissions of photographs disclosing a victim whose body had been dismembered

following death. In *People v. Lindgren* (1979), 68 Ill. App. 3d 141, 386 N.E.2d 87, this court had held it to be error to admit a photograph disclosing a mutilation of the body after death. The supreme court, however, held the photographs to be admissible, saying:

"Our prior cases have granted trial judges discretion to admit, if they choose, photographs of the victim at the scene of the crime which are probative of any fact in issue." *People v. Lindgren* (1980), 79 Ill. 2d 129, 143, 402 N.E.2d 238, 245.

Here, the pathologist was examined concerning whether the injuries in evidence could have been sustained by reason of an automobile accident or a fall, and defendant argued to the jury that he could not have used the baseball bat in evidence with such force if the parties were then within defendant's automobile. We conclude that the photographs were probative of the manner and cause of death, and of the means that might have been used to bring about the death. We find no abuse of discretion in the ruling of the trial court.

Defendant contends that all of the evidence tendered by the prosecution was circumstantial so that the trial court erred in refusing to instruct the jury in the language of the second paragraph of IPI Criminal No. 3.02 (1968), which states:

"You should not find the defendant guilty unless the facts and circumstances proved exclude every reasonable theory of innocence."

■■ In *People v. King* (1978), 58 Ill. App. 3d 199, 373 N.E.2d 1045, this court held that testimony of an admission by defendant is direct evidence of his connection with the crime within the rule that said quoted language of the instruction is not to be given unless all of the evidence in the cause is circumstantial. The principle was theretofore stated by the supreme court in *People v. Brown* (1974), 56 Ill. 2d 312, 307 N.E.2d 356, *rev'd on other grounds* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254. The decisions of the reviewing courts continue to follow the principle. (*People v. Panus* (1979), 76 Ill. 2d 263, 391 N.E.2d 376; *People v. Fletcher* (1978), 59 Ill. App. 3d 310, 375 N.E.2d 1333; *People v. Godsey* (1978), 57 Ill. App. 3d 364, 373 N.E.2d 95, *rev'd on other grounds* (1978), 74 Ill. 2d 64, 383 N.E.2d 988; and *People v. Mickelson* (1975), 32 Ill. App. 3d 813, 336 N.E.2d 806.) We find no error in the ruling of the trial court.

The judgment of the trial court is affirmed.

Affirmed.

CRAVEN and GREEN, JJ., concur.