THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CARSON SEGER *et al.*, Plaintiffs in Error.

*Opinion filed January 18, 1950—Rehearing denied March 13, 1950.*

RALPH T. SMITH, of Alton, for plaintiffs in error.

Ivan A. Elliott, Attorney General, of Springfield, and L. A. Mehrhoff, State's Attorney, of Carrollton, (Harry L. Pate, of Tuscola, of counsel,) for the People.

Per Curiam: On May 16, 1949, the defendants, Carson Seger and Curtis Chapman, were indicted in the circuit court of Greene County for the murder of Howard A. Heininger, alleged to have been committed on April 20, 1949. The court appointed William G. Vogt as counsel to represent both defendants. Seger and Chapman were arraigned on May 20. Each entered a plea of guilty, and the cause was continued to May 25 for a hearing upon matters in aggravation and mitigation of the offense. On the day set for the hearing, defendants appeared in court with their attorney. The trial judge admonished defendants as to the effect of their pleas of guilty but they persisted therein. Thereupon, the People introduced evidence in aggravation. Defendants refused to make a statement of any kind or offer any evidence whatsoever. At the conclusion of the hearing, the court sentenced each defendant to death. On June 23, defendants, represented by new counsel who also represents them here, filed a motion to vacate the judgment. Their motion was heard and denied. At the September term, 1949, we granted defendants' application for a writ of error and made the writ of error a *supersedeas.*

In this court, defendants freely admit they are guilty of the crime of murder. The relief sought is that "their sentence should be commuted to imprisonment in the penitentiary," a nonjudicial remedy, (Const. art. V, sec. 13; Ill. Rev. Stat. 1949, chap. 104½,) or, in the alternative, that the judgment of the circuit court be reversed and the cause remanded, with directions to hold a new hearing on matters in aggravation and mitigation of the offense. The substance of the eight errors relied upon for reversal is reducible to five contentions, (1) that the sentence resulted

from passion and prejudice; (2) that improper evidence was admitted at the hearing on aggravation; (3) that the trial judge abused his discretion in imposing the death sentence without being fully advised of the facts and without examining any witnesses in mitigation; (4) that defendants were represented by incompetent counsel, and (5) that the court erred in denying their motion to vacate the judgment. We recount the facts relevant to a determination of these issues.

At the opening of the hearing on aggravation and mitigation, the trial judge advised the spectators that no one would be allowed to leave the courtroom during the hearing and admonished them not to make any demonstration one way or the other after he pronounced sentence. Dorothy Heininger, the widow of the deceased, testified briefly to the effect that her husband was Howard A. Heininger, thirty-three years of age, employed as a district manager by the Metropolitan Life Insurance Company, and that they lived in Jerseyville and had three children. Mrs. Heininger further related that, on the morning of April 20, 1949, her husband drove to Carrollton in his 1948 Chevrolet automobile to visit an agent there; that he neither returned that night nor telephoned to explain his absence, and that, on the evening of the following day, she was notified he had been killed. Fred Ballard, a friend of the deceased, and sergeant Wilson Schultz, a member of the State police, testified as to certain details of the search for Heininger on April 21. After receiving word that an abandoned car containing insurance literature had been found on a side road a short distance from the highway between Carrollton and Jerseyville, they proceeded there together, identified the car and, upon investigation, found Heininger's body about 150 feet from the side road. Sergeant Schultz also stated that he was present at the scene of the crime with Seger on the morning of April 26 and heard him narrate the facts and

circumstances of the shooting. He also testified that he heard both defendants make their confessions.

Arthur M. Powell, sheriff of Greene County, testified that, on the morning of April 26, Seger was in his custody at the scene of the crime when he told how Heininger had been killed and that he heard both Seger and Chapman make their confessions. Acting upon information obtained from the defendants, the sheriff testified that he had verified Chapman's purchase of a twenty-two caliber revolver in Alton on April 20 and that he had received the same gun from the authorities in Joplin, Missouri, where it had been pawned. The gun and a memorandum of its sale on April 20 were introduced in evidence.

The State's Attorney, conformably to a stipulation with the attorney for the defendants, then offered in evidence written confessions by each defendant. The confessions were substantially the same, both in form and in substance. They were dated April 27 and were signed, witnessed and notarized. Each recited that it was made without force, threat or coercion, with knowledge of the right to not confess, and that no promise had been made by the State's Attorney, or any other officer, for the confession. No contention is made that either confession was involuntary.

Seger, aged nineteen, lived in Alton. Chapman, aged eighteen, lived in White Hall and had attended school in Alton. Both had quit school in their first year of high school.

From their separate confessions, it appears that defendants met in Alton about 9:00 A.M. on April 20 and went to a hardware store where Chapman purchased a twenty-two caliber target revolver. They then hitchhiked from Alton to Carrollton, arriving about 1:00 P.M. In Carrollton, Chapman turned the gun over to Seger and they immediately began to "hitch" a ride back to Alton. Heininger, who was a stranger to them, offered them a ride. Chapman

took the seat beside the driver and Seger sat in the back seat. According to Seger, "We were looking for any car that we could find with the purpose of robbing the occupant or occupants of the car to get some money." Chapman's statement was that, "We decided when he pulled up that he might have some money on him and we could hold him up." After crossing the bridge at Macoupin Creek, Seger pulled out the gun and directed the driver to turn left at the first side road. Heininger turned down the next side road, as directed, and proceeded to a point just beyond a railroad crossing where he turned the car around and, upon orders from Seger, stopped. Defendants then took Heininger's billfold and ordered him to walk into the field beside the road. Defendants followed. When they were about one hundred feet from the road, Seger asked if there was any rope in the car. Heininger replied in the negative. As Heininger started to turn around, Seger shot him three times. When Heininger fell to the ground, Chapman seized the gun from Seger's hand and shot him two more times. Defendants then carried Heininger's body about ten feet to the bank of a gulley, rolled it down the bank, and threw his hat and brief case near his body. Upon returning to the car, defendants were unable to start it, and so were forced to begin their flight on foot. They fled as far west as Oklahoma City, Oklahoma, and then returned to Alton. Defendants were arrested in Alton on April 26 as they were debarking from a bus upon their return.

An autopsy report by Dr. Ferdinand Gorecki was offered in evidence. When defendants' attorney pointed out that the report was not signed, the prosecution called William H. Wolfe, county coroner, as a witness. Wolfe testified that he conducted the inquest and that the autopsy examination had been performed by "Dr. Ferdinand—I am not sure of that last name they said." He identified the proffered exhibit as the autopsy report which the doctor had

submitted to him, whereupon it was received in evidence without objection.

Dr. Groves B. Smith, an alienist, who examined the defendants, made two written reports. Defendants' attorney stated he had read the original reports and they were admitted in evidence without objection. The report on Chapman, so far as pertinent, revealed that he was of low average intelligence; that, after leaving school he had been employed both in Alton and on a farm near Alton owned by a brother-in-law; that he stated he had everything he wanted, and that he had twice been convicted of stealing an automobile with Seger, once in 1946, when he was admitted to probation and, again, in 1948, when he served two months in the county jail as a condition to being admitted to probation. Further findings were that he was nervous and very evasive, overly suggestible, extremely emotionally immature, and easily swayed and dominated by others. On the other hand, Dr. Smith also reported that he was adequately oriented in all fields; that he knew the nature of the acts for which he was indicted; that he knew the difference between right and wrong, exhibiting a clear recognition of murder; that he was free of mental disease, and that he had the power to inhibit his antisocial behavior but persisted, knowing it would sooner or later lead him into trouble.

As to Seger, Dr. Smith found that, after leaving school, he had several temporary jobs and spent much of his time in pool halls and cigar stores; that he was convicted of stealing an automobile in 1946, and, again, in 1948, and that, on the date of the offense charged, he was working and had money. According to the alienist, Seger is adequately oriented in all fields, his stream of thought is relevant and coherent, he has no hallucinations, delusions or paranoidic trends and has full knowledge of the nature of the act which he is alleged to have committed. Seger was neither evasive, nervous, emotional or suggestible. The

doctor reported he was calm, cool and alert, that he was an extremely determined person motivated by a desire to do as he pleased, and that he showed no remorse for his acts or fear of future consequences, stating, "If I am guilty I should get what is coming to me." From his examination of Seger, Dr. Smith concluded that there were no mitigating circumstances in his case.

The last two exhibits, introduced by the prosecution without objection, were a report of the Bureau of Criminal Identification and Investigation of the Department of Public Safety, disclosing that lie-detector tests given to defendants revealed that their confessions were truthful, and a laboratory report from the Division of State Police in the Department of Public Safety relative to ballistics tests and other tests.

The attorney for defendants informed the court that his clients did not desire to offer any evidence or to object to any evidence. After the State's Attorney said he would like to have the defendants make some record in the case so as to show whether any evidence could be introduced in mitigation of the offense, the trial judge remarked that it was their privilege to offer evidence in mitigation and, likewise, their privilege to refuse to testify. Counsel for defendants announced that he had again talked to his clients and that they reiterated their desire neither to make a statement of any kind nor to offer any evidence whatsoever. Upon receiving an affirmative reply to an inquiry of counsel whether defendants thoroughly understood their right to offer evidence of any circumstance which might be in mitigation of the offense, the court pronounced sentence upon each defendant.

The motion to vacate the judgment and sentence was grounded upon allegations (1) that the sentence constituted cruel and unusual punishment; (2) that the judgment was the result of passion and prejudice; (3) that the court erred in not hearing any evidence in mitigation, and (4)

that defendants offered no evidence in mitigation because they were incorrectly advised by their attorney. In their individual supporting affidavits, each defendant stated that, during one or more of their various conversations with Vogt, their former attorney, Powell, the county sheriff, was also present; that, in the course of their conversations with Vogt, both Vogt and Powell advised them to enter a plea of guilty and make no showing of any kind in the courtroom and the worst punishment they would receive would be life imprisonment; that they were and are minors, ignorant of the law and their rights, and, consequently, relied upon the advice of their attorney and the sheriff, and that, in further consequence, each "suggested to his said attorney that no objections be made on his behalf to the evidence presented by the People at the hearing had before sentence, and he failed to take the witness stand in his own behalf to present testimony and evidence in mitigation of the offense to which he had plead guilty." In addition, both defendants alleged that they had and could produce evidence in mitigation which would have been produced upon the former hearing had they not been misadvised. The nature of such evidence was not suggested.

By his counteraffidavit, Vogt denied the allegations made by defendants and stated that, only during a part of one of his many conferences with defendants was the sheriff present, and, at this time, he read to defendants paragraph 360 of chapter 38 of the Illinois Revised Statutes (punishment for murder,) and explained it to them, and that he did not, nor did the sheriff in his presence, at any time, advise defendants to enter a plea of guilty and to refrain from interfering with a speedy disposition of the case, or tell them that such action on their part would result in punishment by sentence to life imprisonment. Affirmatively, affiant stated that, on numerous occasions, he cautioned defendants that, upon a plea of guilty, the court could sentence them to death or imprisonment in the

penitentiary from fourteen years to life; that he had no knowledge or indication from any public officer regarding the punishment which would be fixed upon a plea of guilty, and that, both before and during the hearing, he repeatedly inquired of defendants regarding their request to interpose no objections to the People's evidence and their refusal to testify in their own behalf and present evidence in mitigation of the offense and that, upon each occasion, defendants persisted in their instructions to affiant and in their refusal to permit him to present evidence in mitigation. The counteraffidavit of the sheriff corroborated Vogt's statement.

Defendants first contend that the sentence of the circuit court resulted from passion and prejudice engendered by public opinion. The record is barren of any evidence tending to show that passion or prejudice, however engendered, played any part in the trial judge's determination of the sentence imposed upon defendants. All proceedings were conducted in a fair and impartial manner. Neither by word, deed or act of omission did the trial judge display any sign that he might have been improperly motivated in passing sentence upon defendants. With respect to passion and prejudice engendered by public opinion, defendants point only to the judge's admonition to the spectators at the hearing on aggravation to remain quiet during the course of the hearing and not to make any demonstration one way or the other when he pronounced sentence. Neither the judge's remarks to the spectators nor anything else in the record discloses that the spectators were prejudiced or that, if prejudiced, whether for or against defendants, or that, if prejudiced against defendants, whether to the extent they felt defendants should receive the death penalty. In any event, the mere fact that a judge is aware of the prejudice of spectators against a defendant standing before him for sentencing does not, in the absence of any other evidence, constitute a showing that the judge shared the prejudice of the spectators.

Defendants next contend that improper evidence was admitted at the hearing on aggravation and mitigation. Assertions are made that Dorothy Heininger was called as a witness for the purpose of enlisting the sympathy of the court by her testimony that she was a widow with three small children; that her testimony and that of Ballard and police sergeant Schultz was immaterial; that the confessions were admitted in evidence without being identified and without any testimony as to how they were obtained, and that various other exhibits, such as the autopsy report and alienist's reports, were admitted in evidence in violation of the hearsay rule, thereby depriving defendants of their right of cross-examination. With respect to the testimony of Dorothy Heininger as to her husband's background and his movements immediately prior to his disappearance and death and the testimony of Ballard and Schultz as to their search for Heininger and their discovery of his body, all this evidence was, of course, material and competent. The court may look to the facts of the killing and it may search anywhere, within reasonable bounds, for other facts tending to aggravate or mitigate the offense. (*People* v. *McWilliams,* 348 Ill. 333.) Moreover, defendants are hardly in a position to complain that Dorothy Heininger testified she was a young widow with three small children.

Certain exhibits are claimed to be incompetent. While certain evidence may be incompetent or immaterial in a hearing on aggravation and mitigation, (*People* v. *Riley,* 376 Ill. 364,) it is clear that the evidence contained in the exhibits in question was both relevant and material to the issues on aggravation. All the challenged exhibits pertained either to the facts attending the murder or the background of the defendants, both subjects being matters of proper inquiry in a hearing of this character. (*People* v. *McWilliams,* 348 Ill. 333.) As observed in *People* v. *Hetherington,* 379 Ill. 71, "In such a hearing the court has a right to inquire into the general moral character of the offender,

his mentality, his habits, his environment, his age, his domestic relations, and the motives which influence his conduct."

The third contention advanced is that the trial judge abused his discretion in sentencing defendants without obtaining and considering the full facts in mitigation of the crime. Section 4 of division XIII of the Criminal Code provides, in substance, that where a defendant pleads guilty and the extent of punishment is discretionary with the court, "it shall be the duty of the court to examine witnesses as to the aggravation and mitigation of the offense." (Ill. Rev. Stat. 1949, chap. 38, par. 732.) By virtue of the statute, the prosecution is afforded the privilege of introducing evidence in aggravation and the defendant enjoys the privilege of showing circumstances in mitigation. of the offense. (*People* v. *Curth,* 398 Ill. 322; *People* v. *McWilliams,* 348 Ill. 333.) In the present case, the State's Attorney expressed to the court his desire that defendants introduce whatever evidence they could in mitigation, the trial judge informed defendants of their rights in this regard and, even after their attorney again consulted with them, defendants still persisted in their refusal to offer any evidence in mitigation. Defendants admit they offered no evidence in mitigation, but argue that, notwithstanding, it was the duty of the trial judge to develop and ascertain whatever circumstances might exist in mitigation of the offense. The alienist's reports, although introduced by the prosecution, contained extensive information on all the facts and circumstances usually inquired into in a hearing on mitigation and the court was fully advised of all of the circumstances in mitigation.

Defendants also contend that the attorney appointed to represent them was incompetent and did nothing to assist them in their defense or to obtain a proper hearing for them on matters in aggravation and mitigation of the offense. Defendants were entitled to the appointment of,

and representation by, competent counsel. (Ill. Rev. Stat. 1949, chap. 38, par. 730; *People* v. *Nitti,* 312 Ill. 73.) The question whether a defendant was adequately represented by able counsel must be determined solely from the circumstances of the particular case. (*People* v. *Francis,* 356 Ill. 74.) In the case at bar, there is no showing as to the age of the attorney involved, the character of his practice, his experience, or his professional attainments. His name has been on the roll of attorneys of this court for fifteen years. The affidavits supporting the motion to vacate the judgment disclose that defendants' attorney consulted with them on numerous occasions in the county jail. Defendants do not urge that their attorney failed to conduct a proper investigation of the facts and circumstances of the offense charged.

With respect to their trial, as distinguished from the subsequent hearing on aggravation and mitigation, defendants contend that their attorney was incompetent in that he did not advise them how to plead and permitted them to plead guilty without ascertaining in advance what sentence the prosecution might recommend if they pleaded guilty. Neither allegation is supported by the record. As a matter of fact, defendants, in their affidavits made in connection with their motions to vacate the judgment, both swore that their attorney advised them to plead guilty. Advising confessed murderers to plead guilty does not constitute incompetence. (*People* v. *Riley,* 376 Ill. 364.) To show that their attorney did not advise them how to plead, defendants rely upon his statement, in his counteraffidavit, denying that he advised them to plead guilty. This is far different from their complaint that he did not advise them at all and left them to conduct their own defense. Other statements in the same affidavit show that their attorney consulted with them frequently, that he advised and cautioned them as to the effects of a plea of guilty, and that he read to them section 142 of division I of the Criminal

Code, (Ill. Rev. Stat. 1949, chap. 38, par. 360,) which establishes the penalty for murder and plainly provides that "If the accused is found guilty by a jury, they shall fix the punishment by their verdict; upon a plea of guilty, the punishment shall be fixed by the court." Upon the record made, we cannot say that defendants' attorney did not adequately advise them and represent them with respect to their pleas. Even if he advised them or permitted them to plead guilty this does not constitute incompetence. *People* v. *Riley,* 376 Ill. 364.

Defendants' remaining charges of incompetence all relate to the conduct of their attorney at the hearing on aggravation and mitigation. Specifically, defendants charge that counsel failed to object to the introduction of any evidence offered in aggravation, did not cross-examine any witness, and did not attempt to introduce any evidence in mitigation. There is nothing in the record to show that, at the time of the hearing, defendants were dissatisfied with their attorney or his manner of participating in the hearing. Indeed, from both the transcript of testimony and the affidavits in support of the motion to vacate the judgment, it is evident that defendants' attorney, in agreeing to the admission of evidence, waiving cross-examination and offering no evidence in mitigation, was merely carrying out the express wishes of his clients. Furthermore, even at this late date defendants and their present counsel do not purport to specify which witnesses should have been cross-examined and to what purpose, nor do they suggest any mitigating circumstances which might have been brought to the attention of the court. No instance has been called to our attention where cross-examination of witnesses in aggravation would have benefited defendants. Defendants are, of course, able to point to the absence of objections to the introduction of certain exhibits without a proper foundation and in violation of the hear-

say rule. As previously observed, all evidence so introduced was relevant and material to matters in aggravation. Timely objections to the introduction of such exhibits would have served only to delay the hearing until the persons who took the confessions and the authors of the various reports could be called as witnesses, and, in the end, the same evidence would have been introduced. As to evidence in mitigation, defendants, in the exercise of their constitutional rights, were unwilling to testify and refused to allow counsel to present any evidence in mitigation. In addition, we note that the alienists' reports, previously introduced, contained evidence relative to practically all matters usually touched upon in a hearing on mitigation. Under all the circumstances, it is impossible to say that defendants were inadequately represented.

Lastly, defendants insist that their motion to vacate the judgment should have been granted, thereby affording them an additional hearing on matters in mitigation. The motion did not raise any material point which has not also been made, argued and decided adversely to defendants upon this writ of error. The motion was heard on affidavits of defendants and counteraffidavits of their former attorney and the sheriff of Greene County. Not only was every allegation in defendants' affidavits flatly contradicted but, in addition, defendants did not state, or even intimate, the nature of the evidence in mitigation they expected to introduce, if afforded the opportunity. The trial judge did not err in denying the motion to vacate the judgment.

We have carefully reviewed the entire record and, from our examination, we find that defendants received a fair hearing on matters in aggravation and that no good reason has been suggested or suggests itself for setting aside the order denying their motion to vacate the sentence. They were adequately represented in the trial court and have been well represented upon review in this court. The hear-

ing on aggravation and mitigation occurred before an able and experienced trial judge who safeguarded defendants' constitutional rights in every material respect. The records of this court disclose few, if any, more brutal murders than the murder admittedly perpetrated by defendants. We cannot say that, in the exercise of the judicial discretion committed to the trial judge by law in cases of this character, the sentence pronounced was not warranted upon the record made.

The judgment of the circuit court of Greene County is affirmed. It is the judgment of the court that the original sentence of the circuit court of Greene County shall be executed on the seventeenth day of March, 1950, and the clerk of this court is directed to enter an order to this effect, and furnish a certified copy of the order to the sheriff of Greene County at least ten days prior to the date of execution.