THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JERRY J. KAVINSKY, Defendant-Appellant.

First District (2nd Division)    No. 79-937

Opinion filed December 9, 1980.

Ralph Ruebner and Steven Clark, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Defendant Jerry Kavinsky, age 16 at the time, was charged by grand jury indictment with the aggravated kidnapping (Ill. Rev. Stat. 1977, ch. 38, par. 10—2) and murder (Ill. Rev. Stat. 1977, ch. 38, par. 9—1) of 11-year-old Roger Myers (Roger).[1] After a jury trial, defendant was found guilty on both counts and sentenced to terms of 40 years for murder and 20 years for aggravated kidnapping, to be served concurrently. On appeal, defendant raises the following issues: (1) whether the trial court erred in admitting a statement concerning the crimes which was made by defendant to an employee of the youth home in which he was held following his arrest; (2) whether defendant was denied an impartial jury by the presence of a juror on the panel who had read about the case in the newspaper and who thought that the perpetrators were already convicted; (3) whether reversible error resulted from the admission of evidence of other crimes defendant engaged in or from the prosecutor's inquiry upon matters previously barred by court order; (4) whether defendant was denied his constitutional right to represent himself at trial; and (5) whether the trial court considered improper matters at the hearing on aggravation and mitigation following conviction.

On March 2, 1978, the Myers family home in Westmont, Du Page County, was burglarized and 11-year-old Roger Myers was abducted. His body was found in a wooded area in Willow Springs, Cook County, on April 9, 1978. An autopsy revealed that Roger had died as a result of 23 knife wounds to the upper body.

On April 10, 1978, defendant was arrested for the murder of Roger and was charged in a delinquency petition in Du Page County Juvenile Court. A hearing pursuant to section 2—7 of the Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, par. 701—1 et seq.) was held, and it was determined that defendant should be tried in criminal court. The case was transferred to Cook County, where a grand jury issued an indictment charging defendant with aggravated kidnapping and murder.

At the pretrial stage of proceedings, defendant made several motions either in limine or to suppress evidence. The trial court barred evidence: (a) that defendant had said, "I don't care about that asinine kid," after his

---

[1] Also named in the indictment were Donald Owens and Jesus Garcia. Defendant requested and was granted a separate trial prior to commencement of trial proceedings.

detention hearing in Du Page County; (b) that defendant had been shown a picture of Roger by the police shortly after his arrest and had "thrown a kiss" at it and then burst out laughing; and (c) that defendant had attempted to escape from the Du Page County Youth Home while holding an employee there at knifepoint. The court denied defendant's motion to suppress statements which he made to Robert Farra (Farra), a supervisory employee at the youth home, which concerned defendant's participation in the burglary, kidnapping, and murder. The trial court's basis of this last ruling was that defendant had volunteered the statements and that Farra was not acting as an officer of the court. This latter finding was made in reference to an exclusionary provision of the Juvenile Court Act.

Prior to trial, defendant's public defender was granted a motion to withdraw. Defendant told the trial court that he wished to represent himself. After admonishing defendant on the risks involved in such a course of action, the trial court denied defendant's request and required that he choose an attorney to represent him. Defendant finally acquiesced.

During examination of the State's first witness at trial, one of the jurors indicated in the judge's chambers that she remembered reading about the case in the paper and quoted a statement concerning defendant from the account. She had assumed to that point that the perpetrators had already been convicted. On inquiry from the trial court, she stated that she thought she could remain impartial and base her decision solely on the evidence. She was not dismissed from the panel.

The following summary of the testimony of relevant prosecution witnesses is presented in the chronological order of the events of this case.[2] Dean Metzger was an acquaintance of defendant.[3] On the morning of March 2, 1978, defendant told Metzger of a burglary he had committed on the prior night. A defense mistrial motion based on this testimony was denied. Metzger then described how defendant, himself, and three others (Pennock, Owens, and Garcia) had set out to commit burglaries. The first attempt was abandoned when movement was seen inside the target apartment. The second attempt ended when the resident came to the door. Defense counsel's objection to this testimony was overruled.

Metzger's testimony then centered upon the Myers occurrence. Defendant apparently called the Myers apartment and believed that no

---

[2] Among the State's witnesses were the parents of the murder victim, the latter's school principal, the director of a special school attended by defendant, and the Cook County Medical Examiner. Their testimony is not directly relevant to any issues raised on this appeal and thus will not be reviewed here.

[3] Metzger was promised a 10-year sentence on charges of burglary and aggravated kidnapping in return for his testimony.

one was home. The group drove to the apartment and broke in through the back door. As they went through the house, Metzger found Roger hiding under a bed. Informed of Roger's presence, defendant decided that it would be necessary to kill Roger in order to prevent him from going to the police. Roger was taken to the car in which defendant and the others had come. The group drove to the school of defendant's girlfriend, intending to inject "tic" into Roger "to DOA him." Defendant's girlfriend did not have any of the drug, and defendant rejected her suggestion that they try to buy Roger's silence. The group then left the school, and Metzger was dropped off. Four days later, defendant told Metzger that everything went as planned and that Roger was dead. Asked how he had killed Roger, defendant responded with an apparent stabbing gesture.

Roland Williams was also an acquaintance of defendant. On an evening in late March 1978, defendant and another member of the group which had engaged in the burglary (Owens) came to visit Williams. A conversation took place, during which time the participants were splitting up "some stuff." Defense counsel objected to this testimony, apparently believing that it related to the proceeds of a burglary. However, it is clear from Williams' later testimony that the "stuff" was marijuana. As they talked, defendant brought up the Myers burglary. He described the event to Williams and told the latter how Roger had been brought to the woods by defendant and Owens, and had said "goodbye, Jerry" just before defendant started stabbing him. Defendant described the stabbing in some detail, and then related how he was stopped by a police officer upon leaving the woods. According to Williams, defendant threatened him that night when warning him to keep silent on the matter.

Willow Springs Police Sergeant Olsen testified that on the afternoon of March 2, 1978, while on patrol, he found a car stuck in a roadside snowbank. Some others came along and helped free the car. The sergeant left. As he proceeded down the road, he encountered two young men walking. He stopped them. They stated that they were looking for help to get their car out of the snow. Olsen gave them a ride back to the car that had just been freed. He later identified the two as defendant and Owens. Garcia was identified as the driver of the car which had been stuck. Olsen stated that Garcia's car had been stuck directly across from the place where Roger's body was later found.

Du Page County Sheriff's Detective Weihofen testified that he was assigned to investigate into the burglary of the Myers home and the disappearance of Roger. After an investigation of 5½ weeks, Weihofen was led to Roger's body by codefendant Garcia, who had already been arrested.

Westmont Sergeant Trout was assigned to arrest defendant on April 10, 1978. Defendant was found at his mother's apartment and responded

"what took you so long" upon being advised that he was under arrest. Trout told defendant his *Miranda* rights from memory at the time of the arrest, and then read them to him from a card when they arrived at the police station.

Robert Farra testified that he was the evening shift supervisor at the Du Page County Youth Home at the time defendant was being held there. On April 15, defendant was allowed to make a phone call to his girlfriend in the presence of Farra. Upon completion of the call, defendant appeared to Farra to be upset. Farra asked defendant what he was feeling and if he "was hurting." According to Farra, defendant then began a conversation which eventually led to the Myers burglary. Defendant described to Farra how he had taken Roger to the woods and how he had stabbed the boy. Defendant related that Roger asked him, "Jerry, can you do it fast," and that after being stabbed the first time, the boy had turned to defendant and screamed, "Jerry, you lied to me. You said you could do it fast." Defendant related to Farra that he knew Roger was dead when he saw blood gurgling from Roger's chest. Defendant then told Farra how he had left the woods with Owens.

As the sole witness in his defense, defendant took the stand. He described the early stages of the events of March 2, 1978, much as had the prosecution witnesses. Defendant related that when Roger was found under the bed during the burglary, it was Metzger who stated that Roger had to be killed. Defendant told Metzger that he wanted no part of it. Defendant described how they took Roger and drove to defendant's girlfriend's school, but denied that he intended to inject drugs into Roger. They left the school, dropped off Metzger, then Pennock, and then returned to pick up Metzger. Defendant then left and hitchhiked home. Defendant next saw Metzger at school the following week, where Metzger told defendant that he had "taken care of the problem" and had stabbed Roger to death.

Defendant said that when he had held the conversation with Williams later in the month, he had told the latter that Metzger had done the killing. Defendant also said that while in custody, he was allowed to phone his girlfriend under the supervision of Farra. Farra told defendant that he was guilty of Roger's murder and would probably get the electric chair. Defendant denied to Farra that he killed Roger and told Farra a little bit about Metzger's involvement. Defendant denied on direct examination that he had killed Roger.

On cross-examination, the State's attorney asked defendant if, while in custody, he had taken a knife to an employee at the youth home. Defense counsel objected prior to response, and the trial court admonished the jury to disregard the question. Some time later, defendant was asked if he remembered being shown a picture of Roger by the

police and "kissing off" the picture while laughing. An immediate defense objection was sustained prior to answer, and the jury was again told to disregard the question. The court also denied a motion for mistrial.

After deliberation, the jury convicted defendant of both charges. At the hearing in aggravation and mitigation, the State called the principal of Roger's school, who testified to Roger's positive attributes. Defense counsel's objection to this testimony as improper was denied.

## I.

Defendant contends that the trial court erred in denying his motion to suppress statements made by him to an employee of the juvenile detention facility in which he was placed following his arrest. He urges that the statements were inadmissible under both constitutional[4] and Illinois statutory theories: (A) they were involuntary, rendering their admission into evidence a denial of due process, (B) they were violative of defendant's sixth amendment right to counsel, (C) their admission violated a provision of the Illinois Juvenile Court Act, and (D) they were taken in violation of defendant's fifth amendment privilege against self-incrimination. We address each of these arguments separately.

## A.

■■ When an accused makes a statement to law enforcement personnel in circumstances which indicate that the former's will was overborne or that the statement was not a product of rational intellect, under constitutional principles that statement is not voluntary and thus not admissible into evidence at trial. (*Mincey v. Arizona* (1978), 437 U.S. 385, 398, 57 L. Ed. 2d 290, 303-04, 98 S. Ct. 2408, 2416-17; *Lynumn v. Illinois* (1963), 372 U.S. 528, 537, 9 L. Ed. 2d 922, 928, 83 S. Ct. 917, 922.) For a statement to be admissible as being voluntary, there must be no compulsion or inducement of any sort. (*People v. Lewis* (1979), 75 Ill. App. 3d 259, 278, 393 N.E.2d 1098.) When the proponent of the statement is a juvenile, a more exacting inquiry into this question should be made. (*People v. Simmons* (1975), 60 Ill. 2d 173, 179-80, 326 N.E.2d 383; *In re Bertrand* (1978), 65 Ill. App. 3d 703, 704-05, 382 N.E.2d 660.) Utmost care must be taken to insure that such statements are not coerced, suggested, or the end result of the juvenile's ignorance of his rights or of his adolescent fantasy, fright, or despair. (*In re Shutters* (1977), 56 Ill. App. 3d 184, 187, 370 N.E.2d 1225.) The determination of whether a statement can be classified as being voluntary depends on the totality of the circumstances. (*People v.*

---

[4] In this opinion, reference on these matters will be made to the protections contained in the Bill of Rights, which are, of course, themselves applicable only in Federal cases and available to defendants in State prosecutions only through incorporation under the fourteenth amendment.

*Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731; *In re Shutters.*) The trial court's finding on this issue shall not be disturbed unless the record shows that it is against the manifest weight of the evidence. If it is determined on appeal that a statement admitted into evidence was in fact involuntary, the due process rights of its maker were thereby violated and reversal of any conviction based in part upon that evidence is required. *Mincey v. Arizona.*

Defendant asks this court to find that Farra, the youth home employee, "subtly coerced" him into discussing Roger's death, thereby causing him to "abandon his rights." Defendant asserts that his statement would then not be a product of his free will and should not have been admitted at trial. We have carefully reviewed the testimony given by both Farra and defendant at the hearing on the latter's motion to suppress and cannot agree with this contention. There is no indication that defendant was in any way forced to respond to Farra's initial generalized inquiries; indeed, we see no basis for concluding that defendant need even have remained in the room with Farra at the conclusion of his phone call. The record is barren of any possible implication that defendant was subjected to physical coercion at the time. We are unable to interpret the tone or content of Farra's queries as demonstrating the intent or presence of subtle or patent psychological coercion.[5] The totality of the record in this case indicates that defendant was an intelligent, cunning individual with a hardened personality which belied his chronological age. It simply strains credibility to assert that he was significantly subject to the type of juvenile frailties upon which the above specialized protections of juvenile law are based. We believe that defendant freely and willingly "opened up" to Farra about the crime following a preliminary rambling soliloquy of several minutes on some unrelated or peripherally related matters. The main case cited by defendant in presenting this argument, *People v. Stone* (1978), 61 Ill. App. 3d 654, 378 N.E.2d 263, is clearly distinguishable on the facts and is therefore not controlling.[6] In sum, we are constrained by the law and the facts to rule that the statements made by defendant to Farra were wholly voluntary and thus admissible into evidence without adversely affecting defendant's due process rights.

---

[5] At the conclusion of defendant's phone talk, Farra appears to have asked defendant only what he was feeling and if he was "hurting."

[6] Defendant also cites to *Chambers v. Florida* (1940), 309 U.S. 227, 84 L. Ed. 716, 60 S. Ct. 472, in support of his contention here. *Chambers* is a classic coerced confession case in which black defendants were subjected to "persistent and repeated questioning" for several days, including an all-night session on the final day, by county police in south Florida. The court found these procedures to be in violation of the defendants' due process rights. The facts of the present case are clearly distinguishable.

## B.

Once adversary proceedings have commenced against an individual, the sixth amendment requires that he be afforded the right to legal representation when the government interrogates him. *Brewer v. Williams* (1977), 430 U.S. 387, 401, 51 L. Ed. 2d 424, 438, 97 S. Ct. 1232, 1240; *Massiah v. United States* (1964), 377 U.S. 201, 206, 12 L. Ed. 2d 246, 250-51, 84 S. Ct. 1199, 1203.

"Commencement of adversary proceedings" entails the initial steps taken in the judicial arena of the criminal justice system, whether by formal charge, preliminary hearing, indictment, information, or arraignment. (*Brewer v. Williams* (1977), 430 U.S. 387, 398, 51 L. Ed. 2d 424, 436, 97 S. Ct. 1232, 1238-39.) In this case, defendant had appeared at a detention hearing authorized by the Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, par. 703—6) prior to the date of the conversation with Farra. Since adversary proceedings were thereby commenced against defendant, in order to resolve this issue we must determine whether Farra's actions constituted an interrogation as envisioned by *Williams*.

■■ The statements here were given by defendant at the conclusion of a somewhat lengthy monologue which was seemingly initially responsive to two generalized inquiries made of him by Farra. (See footnote 5.) It is not unreasonable to believe that the extent and content of the information finally given by defendant to Farra was an unanticipated consequence of the questions asked. The questions themselves appear to be, at worst, an unfortunate attempt at amateur psychoanalysis. We do not perceive them to have been part of a "deliberate and designed" attempt to elicit incriminatory information from defendant so as to constitute an interrogation which, under *Williams*, would give the right to the presence of counsel.[7] At the time that the statements were made, Farra himself appears to have been only minimally connected, if at all, through his job at the youth home, with the State's prosecutorial law enforcement functions. Our careful reading of *Williams, Massiah*, and their progeny convinces us that the right to counsel was never intended to extend to such circumstances. We therefore hold that, in lieu of any government interrogation in this instance, defendant had no right to representation by counsel while making the voluntary statements to Farra. We find nothing in the record to establish that defendant's statements to Farra were

---

[7] We note that the United States Supreme Court appears to distinguish between facts which constitute an interrogation for purposes of the sixth amendment right to counsel, and those which constitute interrogation for purposes of the fifth amendment-*Miranda* warnings. (See *Rhode Island v. Innis* (1980), 446 U.S. 291, 300 n.4, 64 L. Ed. 2d 297, 307 n.4, 100 S. Ct. 1682, 1689 n.4.) Our discussion here should not be seen as deciding the question of whether Farra's acts constituted an *Innis* interrogation.

involuntary or coerced. There was thus no error in their admission into evidence which can be based upon this constitutional right.

## C.

The Juvenile Court Act provides that no confessions, admissions, or statements made to the court or any officer thereof by a minor being processed under the Act are admissible against him in any other court proceedings. (Ill. Rev. Stat. 1977, ch. 37, par. 702—9.) Defendant asserts that Farra was an officer of the Juvenile Court and thus could not testify concerning statements made to him by defendant while he served in that capacity.

■■ Farra testified that he was employed in the probation department of Du Page County and was assigned to the youth home as the evening shift supervisor. Under provisions of the Juvenile Court Act, personnel of the probation department are appointed by the chief judge of the circuit court or by the probation director, who is himself appointed by the chief judge. (Ill. Rev. Stat. 1977, ch. 37, par. 706—5(1).) An early supreme court case stated that a probation officer of the Juvenile Court is a mere assistant to the court in its performance of its judicial functions, much like an attorney, master in chancery, receiver, commissioner, or referee. (*Witter v. County Commissioners* (1912), 256 Ill. 616, 623-24, 100 N.E. 148.)[8] A later case noted explicitly that adult probation officers appointed under criminal code provisions were officers of the court that appointed them. (*People ex rel. Callahan v. Whealan* (1934), 356 Ill. 328, 333, 190 N.E. 698.) Assessing the reasoning of these cases, the language of the statute, and the consequences of a contrary holding upon the policy of the Juvenile Court Act (to treat juveniles as parents would treat their children (Ill. Rev. Stat. 1977, ch. 37, par. 701—2)), we are unable to agree with the trial court's determination that Farra was not acting as an officer of the court at the time defendant made the statements to him. As a result, Farra's testimony concerning those statements should have been barred under section 2—9 of the Juvenile Court Act.

This finding does not require automatic reversal of the conviction, however. An error in the admission of evidence can be regarded as harmless if it is clear beyond a reasonable doubt that the error did not contribute to the finding of guilt. (*Chapman v. California* (1967), 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11, 87 S. Ct. 824, 828; *People v. Smith* (1967), 38 Ill. 2d 13, 15, 230 N.E.2d 188; *People v. Bundy* (1979), 79 Ill. App. 3d 127, 134, 398 N.E.2d 345.) When the erroneously admitted evidence did not prove any element of the crime not established by other properly

---

[8] The statutory Juvenile Court provisions relied on by *Witter* were different in form, but not relevantly different in substance from the present section 6—5. See Hurd's Rev. Stat. 1908, ch. 23, par. 174.

admitted evidence, then the error in admitting such evidence did not contribute to the finding of guilt and is harmless. *People v. Landgham* (1970), 122 Ill. App. 2d 9, 24, 257 N.E.2d 484, *appeal denied* (1970), 44 Ill. 2d 585, *cert. denied* (1971), 402 U.S. 911, 28 L. Ed. 2d 652, 91 S. Ct. 1389. ■■ Here, the testimony of Farra essentially is duplicative of that given by Williams and Metzger. Defendant attempts to characterize the testimony of the latter two witnesses as lacking in credibility either because of self-interest or because of the possible impact of a drug problem; however, this assertion overlooks the corroborative and certainly unbiased testimony of Officer Olsen that he gave defendant and Owens a ride near the scene of the crime on the day in question. We do not believe that the jury was presented with any relevant evidence from the testimony of Farra that it did not otherwise receive from the remainder of the State's case. Therefore, the failure of the trial court to exclude this testimony was harmless error beyond a reasonable doubt. We shall not reverse defendant's conviction on this basis.

## D.

■■ For the identical reason, we need not reach the issue of whether the testimony of Farra should have been excluded due to Farra's failure to give defendant his *Miranda* warnings prior to defendant's making of the statements. Assuming that such warnings were necessary and that the failure of Farra to give them violated defendant's fifth amendment right to avoid self-incrimination, the introduction of Farra's testimony at trial was harmless error beyond a reasonable doubt, and under *Chapman* has no impact upon the validity of the conviction entered below.

Summarizing, we find no cause to reverse defendant's conviction due to the introduction of the testimony of the youth home employee to whom defendant made statements which were severely inculpatory.

## II.

Defendant contends that he was denied an impartial jury because one of the jurors recalled reading about the case in the newspapers and thought that defendant had already been convicted.

After being informed of the juror's desire to bring her prior knowledge of the case to the attention of the trial court, the latter conducted an examination of the juror in chambers. The juror was informed that her assumptions concerning a previous conviction of defendant for the crimes were erroneous. The court then stressed to the juror the need to base her decision solely upon evidence presented in court. The juror replied that she would try to so act and that it was her belief that she was capable of so acting. The juror felt that she could give both sides equal treatment. Defense counsel did not see fit to elicit any further responses from the

juror on the subject. The court then spoke to the entire venire and reminded them of their duty to consider only the evidence presented at trial. The jury was also told to ignore further press releases on the trial. No member of the jury responded in the affirmative to the court's inquiry whether anyone felt he or she would be unable to remain impartial in the case.

A juror is not competent to sit on a jury if her state of mind is such that the defendant will not receive a fair and impartial trial. There is no particular test used to make this determination. The most controlling fact is the character and nature of the matter affecting her state of mind. (*People v. Hryciuk* (1954), 5 Ill. 2d 176, 184, 125 N.E.2d 61.) A juror's statement that she will not be influenced by a news report is not conclusive, and the trial court should consider whether, due to the nature and content of the report, the exposure would affect the jury deliberation. (*People v. Henderson* (1976), 39 Ill. App. 3d 502, 506, 348 N.E.2d 854, *appeal denied* (1976), 63 Ill. 2d 560.) Prejudice will not be assumed merely because of a juror's exposure to publicity; it must be shown to actually exist. The burden is on the defendant to show that an opinion has been formed in the juror's mind which raises the presumption of partiality. (*People v. Cole* (1973), 54 Ill. 2d 401, 413, 298 N.E.2d 705.) If a juror can lay aside her opinion and render a verdict based upon the evidence presented in court, she is sufficiently impartial. (*People v. Pisarski* (1972), 6 Ill. App. 3d 235, 240, 285 N.E.2d 551, citing *Irvin v. Dowd* (1961), 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639.) The determination of the impartiality of a juror rests within the sound discretion of the trial court and will not be set aside unless it is against the manifest weight of the evidence. *People v. Cole; People v. Hryciuk.*

■■ We believe that the action of the trial court in regard to the individual juror and as to the panel as a whole adequately redressed any possible taint upon the jury's impartiality. The record simply does not support defendant's contention here. When additional consideration is given to defense counsel's failure to personally examine the possible bias of the juror (see *People v. Pisarski* (1972), 6 Ill. App. 3d 235, 241), we find no prejudicial error.

### III.

Defendant contends that certain evidentiary errors which occurred at trial, including introduction of evidence of other crimes engaged in by defendant and presentation of questions by the State concerning matters barred by an order of the court, mandate a new trial.

### A.

In this case, defendant is on trial for murder and aggravated kidnapping. He objects to the introduction of evidence of burglaries

attempted by him prior to that burglary which led to the death of Roger. The evidence came from the testimony of one of defendant's accomplices in the Myers burglary, and concerned a burglary stated to have been committed by defendant on the prior day as well as three attempted burglaries made on the day in question. The trial court overruled defense objections to this evidence, saying that it consisted of evidence tending to show either common scheme or design, or motive.

The general rule is that evidence of other offenses than that for which the defendant is being tried is inadmissible. There are, however, certain well established exceptions to this rule. Evidence which goes to show motive, intent, identity, absence of mistake, or *modus operandi* is admissible despite the fact that it may show the commission of a separate offense. *People v. Romero* (1977), 66 Ill. 2d 325, 330, 362 N.E.2d 288, citing *People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489.

■■ In *People v. Fletcher* (1978), 59 Ill. App. 3d 310, 375 N.E.2d 1333, the defendant was on trial for the aggravated kidnapping and murder of a police officer. This court held that no error was made at trial when evidence of the defendant's participation in an armed robbery, which occurred just prior to the kidnapping of the police officer, was held admissible as tending to show motive for the abduction and murder of the policeman, the motive being the need of the defendant to escape undiscovered. Here, evidence of the prior attempted burglaries on the day in question is similarly admissible to show the motive of defendant in abducting and murdering Roger. Especially relevant is the evidence concerning an attempted burglary which was abandoned when it was discovered that someone was at home. Thus, we perceive no error in the admission of evidence of these crimes.

■■ Due to differences in the factual background, the testimony relating to the burglary committed by defendant on the night prior to the murder of Roger cannot be held admissible on the same basis. This does not mandate reversal, however. Improperly admitted evidence of another crime is harmless unless it appears that real justice has been denied or that the jury verdict resulted from such evidence. (*People v. Crotty* (1976), 44 Ill. App. 3d 413, 419, 357 N.E.2d 1360.) Here, the record demonstrates that the jury could not have focused upon this evidence as the basis of its decision. The remaining valid evidence strongly supports its determination. Thus, admission of evidence of the prior night's burglary constitutes harmless error.

■■ Defendant also objects to the admission of testimony that, after the murder of Roger, defendant and one of the witnesses were "splitting up some stuff [defendant] had." Defendant appears to believe that this testimony related to the proceeds of a burglary. Later testimony by the witness demonstrates that the "stuff" was marijuana. The fact that the

witness and defendant were smoking marijuana at that time was heavily examined during defendant's questioning of the witness. Thus, defendant errs in believing that the evidence relates to the crime of burglary and, by his examination of the witness, has waived any contention he may have had concerning admission of evidence of the crime of marijuana use.

## B.

Defendant objects to the introduction through questioning of defendant by the State of (1) defendant's alleged "kissing off" of a picture of Roger while in custody, and (2) defendant's attempted escape from the youth home. The trial court had barred presentation of evidence of either of these occurrences prior to trial.

When the evidence validly placed in the record proves the guilt of the defendant beyond a reasonable doubt, introduction of improper "evidence" through asked but unanswered inquiries is not a ground for reversal unless the conduct of the prosecution is so prejudicial as to produce a result not otherwise possible. (*People v. Polk* (1979), 70 Ill. App. 3d 903, 906, 388 N.E.2d 864; *People v. Laurry* (1972), 5 Ill. App. 3d 713, 717-18, 283 N.E.2d 895.) Where the trial court sustains the defendant's objection, orders any testimony given stricken, and admonishes the jury to disregard the evidence, it generally relieves substantial prejudice, preserves fairness, and cures any error. *People v. Lett* (1978), 61 Ill. App. 3d 467, 471, 378 N.E.2d 208; *People v. Laurry.*

■■ The record indicates that just action was taken by the trial court in this case. Neither question was answered by defendant. The testimony of the State's witnesses was sufficient to prove defendant guilty beyond a reasonable doubt. Viewing the totality of the evidence, we are unable to discover any prejudice resulting from the presentation of these questions, however erroneous that presentation may have been. Thus, we find no cause to reverse defendant's conviction on this ground.

## IV.

Defendant contends that he was denied his constitutional right to represent himself when the trial court required that he accept representation by some attorney of defendant's "choice."

■■ The United States Supreme Court has ruled that a defendant has a constitutional right to represent himself at trial, and that forcing a lawyer upon an unwilling defendant is contrary to that right. (*Faretta v. California* (1975), 422 U.S. 806, 834, 45 L. Ed. 2d 562, 581, 95 S. Ct. 2525, 2540-41; see also *People v. Nelson* (1971), 47 Ill. 2d 570, 268 N.E.2d 2.) In order to exercise this right, the defendant must "knowingly and intelligently" act so as to waive the benefits of the constitutional right to representation by an attorney. (*Faretta,* 422 U.S. 806, 835, 45 L. Ed. 2d

562, 581-82, 95 S. Ct. 2525, 2541.) The determination of whether such a waiver has been made depends upon the particular facts and circumstances of each case, including the background, experience, and conduct of the accused. (*Johnson v. Zerbst* (1938), 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023, cited in *Faretta*, 422 U.S. 806, 835, 45 L. Ed. 2d 562, 581, 95 S. Ct. 2525, 2541.) In waiver of counsel cases, a careful inquiry must be made to determine the defendant's ability to conduct his own defense, focusing on his age, level of education, mental capacity, and prior experience with legal proceedings. *People v. Vanderwerff* (1978), 57 Ill. App. 3d 44, 49-50, 372 N.E.2d 1014.

In this case, defendant was at trial a 16-year-old high school student. He had engaged in unruly behavior at his Du Page County juvenile hearing. He had apparently never been involved in a criminal case before. It is evident that, in a case of this type, the trial court was warranted in denying defendant's request to represent himself. The trial court did not err by requiring defendant to retain the counsel of his choice.

## V.

Defendant contends that the trial court erred in taking evidence concerning the murder victim at the hearing on aggravation and mitigation.

Section 5—5—3.2 of the Unified Correction Code (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2) sets forth several factors to which the trial court *shall* accord weight in consideration of sentence. There is no indication in that provision that the enumerated factors are to be exclusive. The supreme court has held that testimony of the victim's background and movements prior to his murder is material and competent evidence, and that the court may look to the facts of the killing and search anywhere within reasonable bounds for other facts tending to aggravate or mitigate the offense. *People v. Seger* (1950), 405 Ill. 222, 231, 90 N.E.2d 637, *cert. denied* (1950), 339 U.S. 936, 94 L. Ed. 1354, 70 S. Ct. 663.

■■ Defendant cites *People v. Dukes* (1957), 12 Ill. 2d 334, 340, 146 N.E.2d 14, for the proposition that the introduction of evidence concerning a murder victim's family is irrelevant and prejudicial, and he analogizes that case to the present one. The language in *Duke* relied upon here concerned the use of those facts at trial as substantive evidence. Clearly, this situation stands in marked contrast since it involves a hearing in aggravation and mitigation. Defendant cites *People v. Miller* (1979), 75 Ill. App. 3d 775, 781, 394 N.E.2d 783, where the court in dicta said that consideration of the victim's age, attainment, and aspirations during sentencing was prejudicial to the defendant. A crucial fact ignored by

defendant, though explicitly emphasized in that holding, is that the crime charged there was reckless homicide from a car accident, which by its nature involved no premeditation. Here, in contrast, the record is replete with evidence of the cold, calculating manner in which defendant took the life of a defenseless 11-year-old boy. The facts of *Miller* are thus distinguishable, and defendant therefore lacks any firm support for his assertion. Since the trial court's sentence should not be disturbed absent an abuse of discretion (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882), we find no reason to require a rehearing on defendant's sentence.

For the foregoing reasons, the convictions and sentences entered by the trial court are affirmed.

Affirmed.

PERLIN, P. J., and HARTMAN, J., concur.